NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0270n.06

No. 08-4727

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Apr 27, 2011

LEONARD GREEN, Clerk

TONY R. GROSS,

    Petitioner-Appellant,

v.

WARDEN, LEBANON CORRECTIONAL
INSTITUTION,

    Respondent-Appellee.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF
OHIO

Before: KENNEDY and MARTIN, Circuit Judges; MURPHY, District Judge.*

STEPHEN J. MURPHY, III, District Judge. Tony Gross appeals the judgment of the district

court denying his petition for a writ of habeas corpus. We **AFFIRM**.

**I. BACKGROUND**

A. Facts

The Ohio Supreme Court summarized the facts as follows:

At around 3:00 a.m. on July 12, 1994, four juveniles were preparing to distribute the
morning newspaper together when they observed a man who appeared to be using the
restroom outside the Certified gas station in South Zanesville, Ohio. The juveniles
also noticed a yellow car with a black stripe on the side parked at the gas station.

While making their deliveries, the juveniles saw the same man drive the yellow car
past them. Suspicious, the juveniles informed Muskingum County Deputy Sheriff
Michael Lutz about the man while on their route. One of the juveniles also tried to
memorize the yellow car's license plate number and later wrote it down. At around

---

*The Honorable Stephen J. Murphy, III, United States District Judge for the Eastern District of Michigan,
sitting by designation.

4:30 a.m., after finishing their paper route, the juveniles returned to a house near the gas station. There, they again saw the yellow car and the same man whom they observed earlier at the Certified station. The man proceeded to break a lock off the men's restroom door and enter the gas station. One of the juveniles ran inside his home and called the police to report the break-in.

Within moments, Lieutenant Michael Lutz arrived at the gas station. Lieutenant Lutz radioed the police dispatcher a description of the yellow car with a license plate of "Nora, Boy, Young", 718 - indicating that the plate read "NBY 718." This was similar to the juvenile's description of the license plate as "NVB 718."

The juveniles approached the gas station and watched as Lieutenant Lutz emerged from his police cruiser and walked to the restroom door. The man who had broken into the gas station came out of the bathroom and went to the front of the station, where he threw something away that sounded like metal when it hit the ground; the police later recovered a metal crow bar. Lieutenant Lutz followed the man, who began to argue with the officer. A fight ensued. The deputy sheriff struck the man on the head several times with his flashlight, but then lost hold of the flashlight. As the two men separated, Lieutenant Lutz reached for his gun, saying "Don't make me do this." Before the officer could retrieve his weapon, however, the man grabbed Lieutenant Lutz's gun and fired twice, hitting the deputy sheriff in the head at least once. Lieutenant Lutz fell to the ground. As the juveniles watched, the man then walked up to Lieutenant Lutz, pointed the gun at the deputy sheriff's head, and fired twice at point-blank range. The man then fled in the yellow car toward Zanesville. One of the juveniles called 911 for an ambulance.

Several passing motorists observed portions of the incident. One of them, Karen Wright, was driving on Maysville Pike on her way to work. As she passed the gas station, Wright noticed Lieutenant Lutz and a man fighting. She slowed down but did not stop, intending to find a pay phone and call for help. Wright later informed officers who arrived on the scene that she had watched the officer's assailant for approximately 30 seconds and that she could see his face. After hearing gunfire, Wright turned around in a parking lot down the road and returned to the gas station. While Wright was waiting in the turn lane to enter the gas station, the yellow car nearly hit her vehicle as it pulled from the gas station and sped away.

At approximately the same time, Shawn Jones was also driving on Maysville Pike. He noticed the juveniles in the gas station parking lot and slowed his vehicle when he heard a gunshot. He observed a man twice shoot Lieutenant Lutz in the face; Lieutenant Lutz was partially lying on the ground when the shooting occurred. Jones drove to a SuperAmerica gas station down the road and told the clerk to call 911.

After going to work to inform his coworkers that he had to return to the scene, Jones returned to the Certified gas station and gave the police his statement.

Similarly, Sherry Fugate was driving to work when she noticed Lieutenant Lutz's police cruiser behind the gas station. While waiting at a traffic light further down the road, she saw police cars racing toward the gas station. She also saw a yellow car come from the direction of the gas station. As Fugate sat at a red light, the yellow car passed her on the right, ran the light, and traveled down Putnam avenue onto Van Buren Street, before pulling into an alley behind a bakery. Fugate saw only one person in the yellow car.

By the time officers arrived at the gas station, Lieutenant Lutz had died. A pathologist from the Franklin County Coroner's Office later determined he had died from three gunshot wounds to the head.

Ron Johnson was selling crack cocaine that morning from his house in Zanesville when Gross arrived in a yellow car. The back of Johnson's house sits on the alley into which Fugate had watched the yellow car disappear. Gross left his car running as he entered Johnson's house. Johnson noticed blood running from a cut on Gross's head and gave the man a towel to wipe off the blood. Gross then traded a .9-mm gun that he had for a $50 piece of crack. As Gross left the house, he told Johnson to hide the gun because "it could be life or death." Johnson therefore proceeded to clean the gun of fingerprints and to empty approximately eleven shells from the weapon. He noticed that the gun had blood on its handle. After subsequently hearing that Gross had been arrested and charged with murder, Johnson initially hid the gun under rocks near the Muskingum River, then later retrieved the weapon and hid it in the woods near his home. Based on information Johnson provided, the police eventually recovered the gun, which was stamped with Lieutenant Lutz's unit numbers.

Also that morning, shortly after the shooting of Lieutenant Lutz, Village of South Zanesville Chief of Police Bob Van Dyne was given the license number that Lutz had communicated to the dispatcher and informed that the car was registered to Gross. Van Dyne was familiar with Gross and drove to his trailer in South Zanesville. After the dispatcher repeated the license number, Van Dyne realized that the vehicle in the driveway was Gross's car. He radioed for assistance.

Several other deputies arrived and set up a perimeter around Gross's trailer. One of the deputies found Gross lying in weeds near his trailer, wearing only pants with no shirt or shoes. He had a recent head injury. Gross eventually surrendered. Because initial radio broadcasts had reported that *two* suspects were involved, the deputies

conducted a one-minute protective sweep of Gross's trailer to ensure that another suspect was not inside.

The deputies conducted a show-up identification. Karen Wright identified Gross as the man she had observed fighting with Lieutenant Lutz and later identified Gross's yellow car as the yellow car she saw. Shawn Jones identified Gross as the man he saw shoot the deputy. Only one of the juveniles, however, was able to select only Gross from a photo array of the suspects, although he expressed some uncertainty. A second juvenile identified five possible suspects, while another juvenile narrowed the photos to three suspects; both groups included Gross. The fourth juvenile was unable to identify anyone from the group of photographs as the man at the gas station. All four juveniles identified Gross's car from photographs as the vehicle that they had observed at the gas station. Sherry Fugate similarly identified Gross's car as the yellow car that had passed her.

The Muskingum County Grand Jury issued a seven-count indictment against Gross. Counts one and two charged aggravated murder, with each count carrying three death specifications–murder of a police officer, felony murder, and murder to escape detection for another offense–as well as firearm specifications. Counts three through six charged Gross with having committed aggravated robbery; each carried a prior aggravated felony conviction specification and a firearm specification. Count seven charged Gross with having had a weapon under disability and carried a specification of a prior felonious assault conviction. The matter proceeded to jury trial on the first six counts and all the specifications that were before the jury, and the trial judge subsequently found Gross guilty of having a weapon while under disability and the remaining specifications. In addition to imposing terms of confinement, the trial court followed the jury's recommendation and imposed the death penalty.

*State v. Gross*, 776 N.E.2d 1061, 1072-75 (Ohio 2002) (paragraph numbering omitted).

    B.  State Court Procedural History

The procedural history in the state courts is extensive and complicated. Prior to sentencing, Gross filed a motion for a new trial. He subsequently filed a supplemental memorandum in support, or in the alternative, a second motion for a new trial. The trial court denied the motion. Gross was sentenced to death and three years of actual imprisonment on the firearm specification, fifteen to twenty-five years on count three, fifteen to twenty-five years on count six, and three to five years on

count seven. All were to run consecutively. Represented by new counsel, Gross appealed the judgment, asserting eighteen assignments of error. The Ohio Court of Appeals affirmed the conviction and sentence. *State v. Gross*, No. 96-055, 1999 Ohio App. LEXIS 2500 (Ohio Ct. App. May 24, 1999). Subsequently, the Ohio Supreme Court affirmed Gross's conviction but reversed his death sentence and remanded for resentencing. *Gross*, 776 N.E.2d 1061.

On remand, the trial court sentenced Gross to thirty years to life imprisonment, to run consecutively to his other sentences. Gross appealed, but then voluntarily dismissed his appeal. Gross subsequently filed a motion for leave to file a delayed application to reopen, application to reopen, and motion to file brief *instanter* in the Ohio Court of Appeals. The motion was denied as untimely. The Ohio Supreme Court dismissed Gross's subsequent appeal as not involving any substantial constitutional question.

Gross filed four motions to reopen his appeal pursuant to Ohio Appellate Rule 26(B). The first was dismissed by the Ohio Court of Appeals in April 2000 for failure to comply with Rule 26. The second, filed on July 3, 2000, was dismissed by the Ohio Court of Appeals for lack of jurisdiction because Gross's appeal of the first motion was pending before the Ohio Supreme Court. The third, filed in January 2003, was denied for failure to show good cause for the untimely filing. The Ohio Supreme Court dismissed the appeal as not involving any substantial constitutional question. The fourth was denied as untimely.

Concurrently with his other motions, Gross also filed two petitions for post-conviction relief in state court. The first was denied as barred pursuant to the doctrine of res judicata. Gross appealed, and the appellate court dismissed the petition as premature because it was filed before

resentencing. The Supreme Court denied leave to appeal. In 2005, Gross filed a second petition for

post-conviction relief. The trial court dismissed the petition as untimely. Gross again appealed,

asserting six assignments of error. The Ohio Court of Appeals affirmed the trial court's dismissal

of Gross's petition. *State v. Gross*, No. CT2006-0006, 2006 Ohio App. LEXIS 6852 (Ohio Ct. App.

Dec. 20, 2006). The Ohio Supreme Court declined further review. *State v. Gross*, 864 N.E.2d 654

(Ohio 2007).

C. Federal Proceedings

Gross, proceeding *pro se*, subsequently filed a petition for writ of habeas corpus. As

amended, the petition alleged the following assignments of error:

Exhausted direct appeal claims

Section I

12-1. This claim involves the unconstitutional one-man show-up identification that took place.

12-2. This ground for relief is premised on faulty jury instructions.

12-3. This ground for relief is premised upon unconstitutional juror misconduct.

12-4. This ground for relief is premised upon unconstitutional photo array identification and the testimony which followed.

12-5. This ground for relief is premised [on the] ineffective assistance of trial counsel.

12-6. This ground for relief is premised upon the remaining claims presented in the direct appeals brief to the Ohio Supreme Court . . . .

Exhausted 26(B) claims to reopen the direct Appeal[] and motion to the Ohio Supreme Court to replace appellate counsel

Section II.

12-7. This claim is premised upon pre-trial legal conflicts of interest the petition[er] had with trial counsel and irreconcilable differences: the failure of appellate counsel to document and present this issue as an assignment of error on direct appeal.

12-8. The petitioner . . . would submit this petition's Appendix E, F, and G as claims for review, and has motioned this Court for the appointment of counsel and to preserve the right to amend this petition with counsel if it's appointed since each of the aforementioned petitions have been exhausted in the state courts excepting for App. G which has sit [sic] in the Fifth District Court since November 21st, 2003, a total of twenty-six months.

Unexhausted 26(B) application to reopen the direct appeals and delayed new trial motion

Section III

12-9. The petitioner would move to have the unexhausted delayed 26(B) application to reopen the appeal[] . . . considered as his (12-9) ground for appeal.

12-10. The petitioner would move to have his delayed application for a new trial, (see App. H), considered as his [tenth] ground[] for relief.

Subsequently, Gross filed a request to further amend the petition to include the following additional claims:

12-11. The petitioner would move to have his 1st R.C. 2953.21 post [conviction] petition . . . considered as his [eleventh] ground[] for relief.

12-12. The petitioner would move to have his 2nd R.C. 2953.21 post [conviction] petition . . . considered as his [twelfth] ground[] for relief.

12-13. The petitioner would move to have his resentencing trial issues and appeal claims (see Appendixes [sic] P through W), considered as his [thirteenth] ground[] for relief.

A magistrate judge granted Gross's request to amend the petition to include claims eleven, twelve, and thirteen, but recommended that the claims be dismissed as procedurally defaulted. The magistrate judge further recommended that all of Gross's other claims be dismissed either as

procedurally defaulted or for lack of merit. Over Gross's objections, the district court adopted and affirmed the magistrate judge's report and recommendation. *Gross v. Jackson*, No. 06-00072, 2008 U.S. Dist. LEXIS 84831 (S.D. Ohio Oct. 21, 2008). Gross filed a motion to alter or amend the judgment, which the district court denied.

The district court declined to issue a certificate of appealability. Subsequently, we granted a certificate of appealability on all claims that were raised in Gross's § 2254 petition. On appeal, Gross, through counsel, asserts: 1) juror misconduct; 2) state court error in failing to grant substitute counsel who would enter a plea of Not Guilty by Reason of Insanity ("NGRI") or to address Gross regarding conflicts with trial counsel about the plea or, alternatively, state court error in not concluding that Gross was denied effective assistance of trial counsel for failure to raise a NGRI plea and of appellate counsel for failure to raise the issue on appeal; 3) unconstitutional photo array identification, and 4) unconstitutional show-up identification.[1]

## II. ANALYSIS

We first deal with the first and second claims raised by Gross through counsel. The Warden asserts that Gross forfeited these claims by not raising them below and that in any event, the claims are procedurally defaulted. Because resolution of the forfeiture issue depends in part on the failure to properly raise the claims in state court, we will consider the issue of procedural default first. Following the procedural default analysis, we consider the merits of the non-defaulted claims of unconstitutional identification.

---

[1]Gross subsequently submitted a supplemental pro se brief. We permitted the Warden to respond to the supplemental brief. After review, we find that the claims lack merit. Moreover, we note that Gross was represented by competent counsel.

No. 08-4272
*Gross v. Warden, Lebanon Correctional Institution*

A. Procedural Default

The Warden asserts that Gross's claim for juror misconduct and for trial court error are procedurally defaulted. Gross contends that the issues were properly raised, but ignored by both the state courts and the federal district court.

1. Legal Standard

A federal habeas petitioner seeking relief from state imprisonment must first exhaust state court remedies. 28 U.S.C. § 2254(b)(1). To comply with the exhaustion doctrine, the petitioner must fairly present the "substance" of his federal habeas claim to the state courts so that the state judiciary has the first opportunity to hear the claim. *Lyons v. Stovall*, 188 F.3d 327, 331 (6th Cir. 1999). The petitioner must present both the factual and the legal bases of the claim. *Hicks v. Straub*, 377 F.3d 538, 552 (6th Cir. 2004). In other words, a petitioner must present "the same claim under the same theory" to the state court. *Id*. at 552-53 (citation and internal quotation marks omitted). It is not sufficient that all the facts necessary to support the federal claim were before the court or that the petitioner made a "somewhat similar" state-law claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (citing *Picard v. Connor*, 404 U.S. 270, 276-77 (1971)).

If a petitioner fails to exhaust his claims, but still has an avenue open by which to do so, his petition is subject to dismissal for failure to exhaust state remedies. *See* 28 U.S.C. § 2254(b)(1)(A). If the petitioner may no longer present his claims to a state court because of a procedural default, the petitioner has also forfeited the claims for purposes of federal habeas review absent a showing of "cause" and "prejudice." *McMeans v. Brigano*, 228 F.3d 674, 680 (6th Cir. 2000). The existence of cause "ordinarily turn[s] on whether the prisoner can show that some objective factor external to

the defense impeded [the defense's] efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). For example, a petitioner could demonstrate cause by showing that "the factual or legal basis for a claim was not reasonably available" or that there was "some interference by officials." *Id*. (citation omitted). To demonstrate prejudice, "[t]he habeas petitioner must show not merely that the errors at trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id*. at 494 (emphasis in original) (alterations, citation, and internal quotation marks omitted).

A petitioner can procedurally default a claim in two ways. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). First, he may fail "to comply with state procedural rules in presenting his claim to the appropriate state court." *Id*. The Sixth Circuit applies a four-part test to determine whether a claim has been procedurally defaulted in this way: 1) whether there is a state procedural rule applicable to the petitioner's claim, with which he has failed to comply; 2) whether the state courts actually enforced the state procedural sanction; 3) whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim; and 4) if prongs one through three are satisfied, whether the petitioner has demonstrated cause for his failure to comply and actual prejudice resulting from the constitutional error. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "[A] procedural default does not bar consideration of a federal claim on habeas corpus review unless the last state court rendering a reasoned opinion in the case 'clearly and expressly states that its judgment rests on a state procedural bar.'" *Thompson v. Bell*, 580 F.3d 423, 437 (6th Cir. 2009) (quoting *Harris v. Reed*, 489 U.S. 255,

263 (1989)). Second, a petitioner may default by failing "to raise a claim in state court, and pursue that claim through the state's ordinary appellate review procedures." *Id*. (internal citations and quotation marks omitted); *see also Deitz v. Money*, 391 F.3d 804, 808 (6th Cir. 2004) ("A federal court is also barred from hearing issues that could have been raised in the state courts, but were not[.]").

Under Ohio law, a defendant may not raise a claim in post-conviction proceedings that could have been raised on direct appeal but was not. *Williams*, 460 F.3d at 806 (citing *Engle v.Issac*, 456 U.S. 107, 125 n.28 (1999)). "Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised on direct appeal, the claim is procedurally defaulted." *Id*. Direct appeal includes review by a state supreme court with powers of discretionary review. *Beldum v. Reese*, 541 U.S. 27, 29 (2004).

2. Juror Misconduct

Gross raises here an alleged "third instance" of juror misconduct involving juror Ryan Nolan. After trial, Nolan informed defense counsel, Gregory Meyers, that Nolan had discussed the case with his parents each night during the trial.[2] Nolan favorably commented on a number of the defense's theories, and told defense counsel that he would have found Gross not guilty but for information he knew about the case before trial. *Id*.

---

[2]There were two other instances of alleged juror misconduct which are not before us. The first involved allegations that Nolan discussed the case at a picnic. The state trial court conducted a hearing on the issue, but did not dismiss Nolan or grant a mistrial. The issue was presented to the district court, but is not raised here. The second involved the alternate jurors' participation in the penalty phase of deliberations. This instance of juror misconduct is moot because the Ohio Supreme Court sustained the error and vacated Gross's death sentence. *Gross*, 776 N.E.2d at 1100.

Gross raised this issue in his supplemental memorandum in support of his motion for a new trial filed post-verdict, but before sentencing. The motion was supported only by an affidavit from Meyers. *Id*. The trial court denied the motion on the grounds that there were no affidavits submitted to support the motion that "would show any type of independent evidence or corroborating evidence in regards to the juror misconduct." The trial court apparently relied on Ohio Rule of Evidence 606(B), otherwise known as the *aliunde* rule, which states that "a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented." All that Gross presented was hearsay in the form of Meyers's affidavit.

The Warden argues that this claim is procedurally defaulted and we agree. Because Gross never raised the claim on direct review before the Ohio Court of Appeals and Supreme Court, his claim is procedurally defaulted. *See Anderson*, 460 F.3d at 806. Gross's arguments do not persuade us otherwise.

Gross included in his appeal to the Ohio Court of Appeals the claim that juror misconduct denied him due process and a fair trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution. He contends that he preserved the claim of the alleged third instance of juror misconduct by stating in his brief that he "raised the issue of jury misconduct in his Motion for a New Trial which the court summarily overruled without taking evidence," and by engaging in a discussion of Ohio Rule of Evidence 606(B), the *aliunde* rule, and exceptions to the *aliunde* rule.

No. 08-4272
*Gross v. Warden, Lebanon Correctional Institution*

Although Gross's brief to the Ohio Court of Appeals did make passing reference to his Motion for a New Trial (which contained the claim he presents now), the brief itself discussed only the first and second instances of alleged juror misconduct, not the third, which is the one now before us. The Supreme Court has held that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find such material." *Baldwin*, 541 U.S. at 32. Further, "the exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record." *Martens v. Shanon*, 836 F.2d 715, 717 (1st Cir. 1988). Rather, the petitioner must present the ground relied upon "face-up and squarely; the federal question must be plainly defined." *Id.*; *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005) (citing *Martens*); *Mallory v. Smith*, 27 F.3d 991, 995 (4th Cir. 1994) (same). Thus, Gross's passing reference to his motion for a new trial did not sufficiently raise the claim of the third instance of juror misconduct. Moreover, Gross's discussion of Rule 606(B) and the *aliunde* rule focused on the second instance of juror misconduct. Thus, Gross failed to present both the factual basis for the third instance of juror misconduct and the legal theory on which it rested to the Ohio Court of Appeals. *Hicks*, 377 F.3d at 552 (finding that petitioner must present both legal and factual bases of a claim to state court).

Gross also failed to raise the claim to the Ohio Supreme Court. He argues that he properly raised the claim in his direct appeal to the Ohio Supreme Court by asserting in his Fourteenth Assignment of error that:

> A capital defendant is entitled to a fair and reliable determination of his guilt and sentence by a jury that is properly instructed and that follows the Court's instructions where the jury ignores the Court's admonitions and discusses the case outside of the jury room and where jurors intimidate other jurors there is a denial of due process and a fair trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments, as well as Article 1, Sections 2, 9, 10, and 16, of the Ohio Constitution.

Although the assignment of error references jurors discussing the case outside of the jury room, the body of Gross's brief discusses only the first and second instance of juror misconduct. As a result, the court confined its analysis to those two incidents. *Gross*, 776 N.E.2d at 1093. Presenting the state court with part of his juror misconduct claim did not preserve the issue of the alleged third instance of juror misconduct now before us. *See, e.g.*, *Wong v. Money*, 142 F.3d 313, 321-22 (6th Cir. 1998) (finding ineffective assistance of counsel claim procedurally defaulted where petitioner's argument in state court relied upon different grounds than argued in habeas proceedings); *Pillette v. Foltz*, 824 F.2d 494, 497-98 (6th Cir. 1987) (holding that the petitioner failed to exhaust state remedies for all ineffective assistance of counsel claims where state courts were presented with only one aspect of petitioner's attorney's performance). Accordingly, Gross's third alleged juror misconduct claim is procedurally defaulted.

We next consider whether Gross has demonstrated cause and prejudice for the default. Aside from arguing that the third instance of juror misconduct was fairly presented to the state court, Gross argues only that the trial court's summary dismissal of his motion for a new trial resulted in the failure to establish a clear record on both the issue itself and its impact on the trial. Contrary to Gross's assertions, however, the trial court's summary dismissal of the motion in no way prevented Gross from raising the claim on direct appeal. Gross, therefore, has failed to demonstrate cause.

Because cause has not been demonstrated, we need not consider whether there was prejudice resulting from the default. *Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).

### 3. NGRI Plea

Gross asserts that the trial court erred by failing to grant him substitute counsel or address the concerns he raised regarding counsel. He alternatively argues that the "state courts" erred by not finding that Gross was denied both the effective assistance of trial counsel for failure to pursue an NGRI plea and the effective assistance of appellate counsel for failure to raise the claim on appeal. Although Gross asserts these as alternative claims in the same heading, we address them separately.

### a. Trial Court Error

Gross argues that the state court ruled contrary to clearly established federal law by failing to grant substitute counsel who would enter a plea of NGRI or to address him regarding the plea. The Warden says these claims are procedurally defaulted.

There is disagreement about whether Gross argued before the trial court that substitute counsel should be appointed, but even if he did, he did not properly raise the issue on direct appeal. Accordingly, the claim is procedurally defaulted.

A review of the record demonstrates that Gross raised issues relating to a plea of NGRI three times, but always in the context of ineffective assistance of counsel claims.[3] Raising the claim of

---

[3]First, Gross raised the claim in his initial Rule 26(B) application to reopen appeal that the trial attorney "should have consulted both a psychiatrist – concerning the possibility of a brain injury from prior drug usage: the effects of the prescription drugs, and a pharmacist, on the likelihood of the claimed effects." Second, in his motion to amend his first petition for post-conviction relief, Gross asserted that "trial counsel failed in its duties to enter a plea of not guilty by reason of

ineffective assistance of counsel for failure to pursue a plea of NGRI does not preserve the claim that the trial court erred by failing to grant substitute counsel who would enter a plea of NGRI. *See White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005) (finding that raising an ineffective assistance of counsel claim on the basis of failure to raise a *Batson* challenge did not preserve the issue of whether prosecution improperly excluded women from jury because the two claims are "analytically distinct"); *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987) (finding that where the difference between two similar claims is a difference in legal theory, exhaustion of one claim is not sufficient to exhaust the other). Whether the trial court erred is analytically distinct from the issue of whether there was ineffective assistance of counsel. Gross did not preserve his claim for trial court error by raising related claims of ineffective assistance of counsel.

It appears that Gross squarely raised the issue of trial court error presented here only once. In his fourth application to reopen his appeal pursuant to Rule 26(B), Gross asserted that the trial court failed to adequately respond to the concerns raised in his motion to appoint new counsel, including his desire to proceed pro se if counsel would not change his plea to NGRI. The petition was denied as untimely. The Court of Appeals held that "App. R. 26 (B) provides an application shall be filed within 90 days of the appellate judgment unless the applicant demonstrates good cause," and Gross failed to demonstrate good cause for the untimely application.

---

insanity." He also claimed that he had a chronic history of drug and alcohol abuse, that he had tested positive for cocaine in his system shortly after the incident, and that several witnesses said that he was intoxicated at the time of the incident. Finally, Gross raised the claim in his second petition for post conviction relief, asserting that "[t]rial counsel [failed] to investigate the petitioner's extensive history of multiple substance abuse and addiction: [sic] call witnesses that were available and enter a plea of temporary insanity by reason of voluntary intoxication."

Gross's claim is procedurally defaulted. It is clear that Ohio law required Gross to raise his claims within ninety days of the appellate judgment. *See* Ohio R. App. P. 26(B)(1). The Ohio Court of Appeals was free to deny the application, which it did. The time requirement in Rule 26(B) is an adequate and independent state ground. *See Monzo v. Edwards*, 281 F.3d 568, 577-78 (6th Cir. 2002).

Gross appears to assert two causes for his default. First, he argues that he attempted to address his concerns about trial counsel's failure to investigate and pursue a NGRI plea, but that the trial court never addressed him, thus denying him an opportunity to develop the record. He argues that the trial court's failure was an objective factor external to the defense, which prevented him from complying with procedural rules. This argument is not well received. Even if the trial court improperly prevented Gross from addressing the court, and thereby prevented him from making a record of his claims against counsel, it did not prevent Gross from timely raising the claim on direct appeal.

Second, Gross argues that he was prevented from raising the claim on appeal due to ineffective assistance of appellate counsel. An ineffective assistance of counsel claim may serve as the cause to excuse procedural default, but only where the claim itself has not been procedurally defaulted, or, if procedurally defaulted, cause and prejudice exist for the default. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Accordingly, in order to determine whether ineffective assistance of appellate counsel can constitute cause for Gross's procedural default of his trial court error claim, we must consider whether his claim of ineffective assistance of appellate counsel is itself procedurally defaulted.

Gross raised ineffective assistance of appellate counsel in his third and fourth delayed Rule 26(B) applications, both of which were dismissed as untimely. Because the Ohio Court of Appeals relied on a procedural bar to dismiss the claim, and because the timeliness requirement in Rule 26(B) is an adequate and independent state ground, *Monzo*, 281 F.3d at 568, the claims are procedurally defaulted. Gross does not assert anywhere in his response brief that there was cause for this procedural default. Thus, ineffective assistance of appellate counsel cannot serve as cause for Gross's procedural default of his trial court error claim.

Gross's claim that the trial court erred in refusing to grant substitute counsel or allow him to proceed pro se is procedurally defaulted.

b. <u>Ineffective Assistance of Counsel</u>

Gross alternatively raises "state court" error in failing to find that Gross was denied the effective assistance of trial and appellate counsel. We have already found that the ineffective assistance of appellate counsel claim is procedurally defaulted.

The Warden asserts that the trial counsel claim is also procedurally defaulted. Gross claimed in both of his petitions for post-conviction relief that he was prevented from entering a plea of NGRI due to ineffective assistance of trial counsel.[4] The first petition was dismissed by the trial court because Gross failed to comply with Ohio procedural law requiring him to raise his claim on direct appeal. The Ohio Court of Appeals dismissed the appeal on the grounds that the assignments of

---

[4]In his first Rule 26(B) application, Gross also raised the issue that his trial counsel should have consulted a psychologist concerning the possibility of a brain injury. This argument did not address counsel's failure to enter a plea of NGRI, and, accordingly, did not properly present to the state court both the factual and legal bases of the claim. *Hicks*, 377 F.3d at 552.

error contained therein were premature pursuant to Ohio Rev. Code § 2953.21(A)(2). The second petition was dismissed as untimely pursuant to Ohio Rev. Code § 2953.21(A)(2).

We agree that Gross's ineffective assistance of trial counsel claim is procedurally defaulted. He failed to comply with Ohio procedural rules, and the state courts enforced these rules when they dismissed his petitions for post-conviction relief. Failure to comply with Ohio rules of procedure for post-conviction relief has been considered an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *See Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998) ("[A]ppellant never raised this specific issue on direct appeal to the Ohio Court of Appeals and the Ohio Supreme Court and is now barred from doing so because of procedural default[.]"). Gross offers no cause for his procedural default, other than ineffective assistance of appellate counsel, which we found is procedurally defaulted itself. Thus, we are barred from considering the claim on habeas review.

4. Conclusion on Procedural Default

Based on the foregoing analysis, we concludes that Gross's claims of juror misconduct, trial court error, and ineffective assistance of counsel relating to his attempt to plead NGRI are procedurally defaulted.

B. Merits

In his remaining claims, Gross argues that the state courts' failure to suppress pretrial photographic and show-up identifications involved an unreasonable determination of the facts and a decision contrary to clearly established federal law. The district court dismissed these claims on

the merits. *Gross*, 2008 U.S. Dist. LEXIS 84831, at *8-10. We review the district court's decision

de novo. *Joseph v. Coyle*, 469 F.3d 441, 449 (6th Cir. 2006).

We are bound by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"). Under AEDPA, an application for a writ of habeas corpus can only be granted when

the state court's adjudication of the claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the state court proceedings.

28 U.S.C. § 2254(d). A state court adjudication is "contrary to" Supreme Court precedent "if the

state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

law" or "if that state court confronts facts that are materially indistinguishable from a relevant

Supreme Court precedent and arrives at [an opposite result.]" *Williams v. Taylor*, 529 U.S. 362, 405

(2000). A state court adjudication is an "unreasonable application of" clearly established federal law

if "the state court identifies the correct governing legal principle . . . but unreasonably applies that

principle to the facts of the prisoner's case" or if a "state court decision either unreasonably extends

or unreasonably refuses to extend a legal principle from the Supreme Court precedent in a new

context." *Harris*, 526 F.3d at 909 (citations and internal quotation marks omitted). To obtain habeas

relief, a petitioner must show that "the state court's rejection of his claims was so lacking in

justification that there was an error well understood in existing law beyond any possibility for

fairminded disagreement." *Herrington v. Richter*, 131 S. Ct. 770, 786-87 (2011). In addition, a state

court's determination of factual issues is presumed to be correct, and the petitioner has the burden of rebutting the presumption of correctness with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The introduction of a pretrial identification that is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" violates a defendant's right to due process. *Thigpin v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986) (internal quotation marks and citation omitted). A court must first determine whether an identification procedure was unduly suggestive. *See Ledbetter v. Edwards*, 35 F.3d 1062, 1070-71 (6th Cir. 1994). If it was, the court must evaluate the totality of the circumstances to determine whether the identification was reliable nonetheless. *Id*. Five factors (the *Manson* factors) are considered when determining the reliability of pretrial identification: 1) the opportunity of the witness to view the criminal at the time of trial; 2) the witness's degree of attention at the time of the observation; 3) the accuracy of the witness's prior description of the criminal; 4) the level of certainty of the witness when confronted by the criminal; and 5) the length of time between the crime and confrontation. *Id*. (citing *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977) and *Neil v. Briggers*, 409 U.S. 188 (1972)). "Reliability is the linchpin in determining the admissibility of identification testimony[.]" *Manson*, 432 U.S. at 114.

1. Photographic Identifications

Gross challenges the admissibility of photographic identifications made by the four juvenile witnesses: Jason Stevens, Robert Hill, and Courtney and Max Ford. Gross asserts that the totality of the circumstances surrounding the juvenile witnesses' photographic and in-court identifications of Gross were unreliable and violated his rights to due process and a fair trial pursuant to Article I,

No. 08-4272
*Gross v. Warden, Lebanon Correctional Institution*


Sections 2, 9, 10, and 16 of the Ohio Constitution[5] and the Fifth, Sixth, Eighth, and Fourteenth

Amendments of the United States Constitution. On the issue of the photographic identifications, the

Ohio State Supreme Court found that:

> Only one of the four juveniles positively identified Gross from two photographic
> arrays. That witness stated that he ranked the certainty of his pretrial identification
> of Gross as a "five" on a scale of one to ten, with ten equaling the most certainty. On
> cross-examination, the juvenile then admitted that he had seen Gross's picture in the
> newspaper and that his subsequent in-court identification had been a "three" on the
> certainty scale. Of the remaining three juveniles, two could identify Gross only as
> part of a group that included other photographs – and one of these juveniles testified
> that, after failing to identify Gross in an earlier courtroom appearance, his at-trial
> identification depended in part on flashback dreams that he had been having in the
> interim. The fourth juvenile made no identification.
>
> We find that the trial court did not abuse its discretion in admitting the
> identifications. The juveniles' accounts of the investigators' procedures undercut
> Gross's argument that impermissibly suggestive state action tainted the identification
> process. To the contrary, the record reflects the state's careful efforts to avoid
> suggestiveness. The investigators showed the juveniles between 30 and 100
> photographs, and there is no evidence that the investigators made suggestions or
> comments to the juveniles, rushed them, or told them whether they had picked
> Gross's photograph. Moreover, the circumstances that Gross cites as suggestive -
> that the juveniles encountered media reports and saw Gross go into the courtroom -
> go to the weight to be given the identifications, rather than their admissibility. *See*
> [*State v.*] *Brown*, 38 Ohio St. 3d [305, 310-311], 528 N.E.2d 523 (holding that
> allegedly suggestive circumstances that did not constitute *state* action go to weight
> and reliability of testimony, not admissibility). Even if we were to conclude that the
> trial court erred, however, no prejudice attached. *See id.* at 311, 528 N.E.2d 523.
> Defense counsel conducted a probing examination of the circumstances surrounding
> both the photographic arrays and the identifications to allow the jury to assess the
> value of the juveniles' testimony. Given the totality of the circumstances
> surrounding the photograph selection procedures and the identifications, we cannot
> say reversible error existed.

---

[5]We consider only alleged federal constitutional violations. Federal courts cannot grant
habeas relief for violations of state law. *See* 28 U.S.C. § 2254(d); *Estelle v. McGuire*, 502 U.S.
62, 67-68 (1991).

No. 08-4272
*Gross v. Warden, Lebanon Correctional Institution*

*Gross*, 776 N.E.2d at 1076-77. We find that Gross has failed to demonstrate either that the state court's determination of facts was incorrect, or that the state court's decision was contrary to or an unreasonable application of clearly established law.

Gross argues that the procedure used was unconstitutional for three reasons: 1) that because Stevens and Hill were exposed to Gross's picture multiple times during the identification process, they may have made an unconscious transferrence;[6] 2) that Stevens and Hill were asked to view the photo arrays in a way that implied the suspect's picture was among those contained in the photo array;[7] and 3) that the juvenile witnesses did not have an adequate opportunity to view Lieutenant Lutz's assailant during the crime and were unable to identify Gross the first time they viewed a photo array or saw Gross in person.

We must first determine whether the procedure used in the photographic identifications was unduly suggestive. We find that it was not. First, the issues of unconscious transferrence and the witnesses's ability to view the assailant during the crime go to the reliability of the identification, the second step in the analysis. *Cornwell v. Bradshaw*, 559 F.3d 398, 414 (6th Cir. 2009) (finding that possibility of unconscious transference "go[es] to the reliability of the identification" and does not "relate to the suggestiveness of" the identification procedure); *Manson*, 432 U.S. at 114 (stating

---

[6]Unconscious transferrence occurs when "a face seen in one situation is mistakenly remembered to have been seen in another." Randolph N. Jonakit, *Reliable Identification: Could the Supreme Court Tell in Manson v. Braithwaite?*, 52 Colo. L. Rev. 511, 523-24 (1981).

[7]Gross argues that this subjected both identifications to the "Rosenthal Effect." Gross asserts that when witnesses are informed that the suspect is among their choices in an identification procedure, it raises the likelihood of misidentification by 24%. Steven Grossman, *Suggestive Identifications: The Supreme Court's Due Process Test Fails to Meet Its Own Criteria*, 11 U. Balt. L. Rev. 53, 103, n.276 (1981).

that first factor in determining reliability of identification is witness's opportunity to view criminal at time of crime). Second, the circumstances of the identifications do not demonstrate undue suggestiveness. Hill was shown between 60 and 80 photographs, and narrowed the photographs down to three, one of which was Gross. Hill subsequently was unable to identify Gross during a motion hearing, but did identify him on the day of the trial based on flashbacks and dreams. On the day of the incident, Jason Stevens was shown a book of photos, containing what he estimated to be around 100 photos, but did not make an identification. The next day, Stevens was shown around 65 photos and was able to identify Gross. Stevens admitted during cross-examination that he had seen Gross's picture in a newspaper. At a hearing, Stevens stated that he did not recognize Gross when he first saw him in the courtroom, but that after he "got a look at him," he recognized him. At trial, Stevens identified Gross, although he stated that he looked different than he had the day of the shooting. Stevens testified that his level of certainty regarding his identification of Gross on the day of the hearing was a three out of ten, with ten being the highest. Neither Courtney Ford nor Max Ford were initially able to make an identification based on photographs shown to them. Six months later, after being interviewed by police, Courtney Ford was able to narrow down a photo array to five possible suspects, one of whom was Gross.

Gross argues that the officers acted in a manner that was unduly suggestive by telling Hill that the purpose of viewing the array was to see if he could identify a suspect, making Hill aware that the officers wanted him to pick someone out of the photo array, and by instructing Hill to choose one photo after he had narrowed the photo array down to three photographs. There is no evidence to demonstrate that the officers acted in an unduly suggestive manner. In particular, there is no

evidence the officers said or did anything to suggest to Hill or Stevens which picture he should choose. *See Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001) (finding that to be unduly suggestive, a procedure must "steer[ ] the witness to one suspect or another, independent of the witness' honest recollection."); *see also United States v. Russell*, 532 F.2d 1063, 1068 (6th Cir. 1976) (finding that officers' behavior was unduly suggestive where witness was under impression that suspect's photo was in array, and, after picking "wrong" photograph, officers "told her, in effect, that she had chosen the wrong photograph, and that the other photograph portrayed the person authorities believed to be guilty").

Finding no error ourselves, we find no unreasonable constitutional errors by the state courts by admitting the photographic identifications or allowing the in-court identifications of Gross.

2. Show-up Identifications

Gross also argues that the show-up identifications made by Karen Wright and Shawn Jones were unduly suggestive. The Ohio Supreme Court stated:

> [W]e [cannot] say that the show-up identification procedures constitute reversible error. Several hours after the murder of Lieutenant Lutz, investigators took both Karen Wright and Shawn Jones to view Gross, who was in custody near the scene. Neither witness spoke to the other. From separate police vehicles, the witnesses observed Gross, who stood with his hands behind his back, between two officers. Both Wright and Jones identified Gross at the scene, in court for a motion hearing, and at trial. Gross complains that the trial court erred in admitting these identifications.
>
> We agree with Gross that the show-up identification was suggestive. We also reiterate that the practice of showing suspects singly to persons for the purposes of identification and not as part of a lineup, has been widely condemned . . . . But the ultimate focus in determining whether reversible error exists is not just on whether the practice was used, but on whether it was so suggestive as to create . . . a very substantial likelihood of irreparable misidentification

*Gross*, 776 N.E.2d at 1077. The magistrate judge concluded that although show-up identifications are inherently suggestive, the totality of the circumstances indicated that the in-court identifications were not constitutionally prohibited. *Gross v. Jackson*, 1008 U.S. Dist. LEXIS 37095, at *87 (S.D. Ohio May 6, 2008). The district court adopted the magistrate's recommendation. *Gross*, 2008 U.S. Dist. 84831 at *9.

"The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds, Griffith v. Kentucky*, 479 U.S. 314 (1987). Whether a show-up identification is a due process violation, however, depends on the totality of the circumstances. *Id*.

Gross argues that the trial court erred in determining the facts by ignoring several "glaring" problems with Wright and Jones's identifications.[8] He further asserts that the determination made by the Ohio Court of Appeals and Ohio Supreme Court that the trial court did not err in admitting the identifications was contrary to and an unreasonable application of federal law, specifically the

---

[8]Among the errors that Gross alleges are: 1) Jones's testimony that he could not initially say whether the assailant was black or white, and a police sergeant admitting that if a witness cannot be sure of a person's race, he should not be subjected to a show-up identification; 2) the limited time period in which Wright and Jones had to view the assailant, the speeds at which they were driving past the scene of the crime, and the fact that their attention was split between driving and witnessing the event; 3) the fact that it was dark outside; 4) Jones's testimony that he did not notice the injury and blood on Gross's face during the show-up identification despite the fact that it was light outside, which Gross argues undermines the assertion that Jones could identify Gross at the scene while it was dark out; 5) the fact that neither Jones nor Wright gave a detailed description of the assailant; 6) Gross's allegation that Wright identified Gross in court on the basis of the show-up identification; and 7) Jones's testimony admitting that his attention was focused on the gun.

*Manson* factors. Even assuming that the show-up identification was unduly suggestive, the totality of the circumstances demonstrates that Wright and Jones's testimony was reliable.

Karen Wright was driving past the Certified gas station on the day of Lieutenant Lutz's murder. When she saw an altercation taking place, she slowed her vehicle down to the point where she was almost stopped. Wright estimated that she could not have been going more than ten miles per hour. Although it was dark out at the time, the area where the altercation was taking place was well-lit. She testified that she could tell that one person engaged in the altercation was a deputy sheriff from the patches on his sleeve, and that she was able to see the other person's face. Wright kept driving to find a pay phone, but turned around after hearing gun shots. When she got back to the Certified gas station, she saw a yellow car exit the gas station and head towards Zanesville. She testified that when she first drove by the Certified station she could see the assailant's face for 25 seconds, and observed that he was taller than Lieutenant Lutz, had shaggy hair, and some facial hair. A few hours later, she was taken by an officer for a show-up identification of Gross at the site of apprehension. Gross was standing between two officers, outside a police cruiser, with his hands behind his back. Wright said that she recognized Gross as soon as she arrived at the scene based on his build and his face.

Jones was driving by the Certified gas station on his way to work. He slowed down when he saw the juveniles beside a car in the parking lot. At that point he heard a shot, and slowed down to approximately 15 miles per hour; he then heard two more shots. When he looked in the vicinity of the shots, he observed the deputy sheriff, partially down on the ground, and a guy who was "kind of stocky," with "curly hair, moustache, [and a] scraggly beard." Jones testified that he witnessed

the shooting of Lieutenant Lutz from about 10-15 feet away, that he had a good opportunity to view the events for about three to five seconds, and that the only thing he could not see were the assailant's eyes. In his initial statement to police, Jones told police that he was not sure if the assailant was white or black, but quickly told police that the assailant was not black. Jones was later brought to the scene of apprehension where he was asked if Gross, who was flanked by police officers with his hands behind his back, was the man he had seen at the Certified gas station. Jones confirmed that Gross was. Jones identified Gross at a hearing and asserted that Gross was the man he had seen at the Certified gas station, though Jones admitted that he had seen media reports, including pictures, since the incident. Jones identified Gross in the courtroom during the trial as the man he had seen at the Certified gas station.

Both Wright and Jones had the opportunity to view the assailant at the time of the crime, gave general descriptions of Gross before their identification of him, and made their identifications only hours after the crime occurred. Therefore, we find that the identifications were reliable and that the state court's decision was not contrary to or an unreasonable application of federal law.

### III. CONCLUSION

Gross's claims of juror misconduct and trial court error surrounding his decision to plead NGRI are procedurally defaulted. Further, Gross has not demonstrated that the trial court reached a decision that was contrary to or an unreasonable application of clearly established federal law with regards to the photographic, in-court, and show-up identifications. Accordingly, we **AFFIRM** the district court's denial of Gross's petition for habeas corpus.